IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

Active Marketing Group, Inc.,

    Plaintiff,

v.

EB Brands Holdings, Inc., d/b/a EB Sport Group and EB Brands,

    Defendant.

Case No. 16-5079 TLB

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

For its Complaint against the Defendant, Plaintiff states and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Active Marketing Group, Inc. ("AMG") is a Missouri corporation with its principal place of business located in O'Fallon, Missouri. Under 28 U.S.C. § 1332(c)(1), AMG is a citizen of the State of Missouri.

2. Defendant EB Brands Holdings, Inc. ("EB") is a Delaware corporation with its principal place of business located in Elmsford, New York. Under 28 U.S.C. § 1332(c)(1), EB is a citizen of both the State of Delaware and the State of New York.

3. On information and belief, EB transacts its business through various unincorporated divisions or "trade names," including EB Sport Group and EB Brands. On information and belief, neither EB Sport Group nor EB Brands has any independently recognized legal status.

4. The Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) based upon the complete diversity of citizenship between AMG, on the one hand, and EB, on the

other hand, because the amount in controversy, exclusive of costs and interest, exceeds the sum of $75,000.00.

5. The Court has personal jurisdiction over EB, as EB has minimum contacts with the State of Arkansas and the Western District of Arkansas, EB has purposefully availed itself of the privileges of conducting business in the State of Arkansas and in the Western District of Arkansas, and EB regularly conducts business within the State of Arkansas and within the Western District of Arkansas. Additionally, the Court may exercise personal jurisdiction over EB pursuant to Ark. Code Ann. § 4-70-304 (2015).

6. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to AMG's claims occurred in Arkansas. Venue is also proper is this judicial district under Ark. Code Ann. § 4-70-302(c) (2015), which states that a provision in a contract "establishing venue for an action arising under the contract in a state other than [Arkansas] is void."

## FACTS COMMON TO ALL COUNTS

A. **Background**

7. AMG is an independent contractor sales representative, engaged in the business of representing manufacturers and distributors as a sales agent. AMG is compensated for its services through commissions on sales arranged for manufacturers and distributors.

8. One of AMG's principal customers is Walmart. Walmart's principal place of business and purchasing departments are located in Bentonville, Arkansas. To service the Walmart account for EB, AMG maintains an office in Bentonville, Arkansas. AMG has several employees in Bentonville, Arkansas, dedicated to servicing the Walmart account for EB. AMG conducts substantial business in Arkansas out of its Bentonville office.

9. EB, through, in part, EB Sport Group and EB Brands, is engaged in the business of manufacturing and distributing sports and leisure products. One retailer to whom EB ultimately distributes its products is Walmart.

10. AMG's business relationship with EB dates back to 1989. For 27 years, AMG has assisted EB in a sales representative capacity by placing EB's products for sale with retailers like Walmart.

B. **The Sales Representative Agreement**

11. AMG and EB[1] entered into a new Sales Representative Agreement on December 31, 2014 (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit A and is incorporated herein by reference.

12. AMG's president, Robert Grisoff, Sr., executed the Agreement on behalf of AMG. EB Sport Group's and EB Brands' chief executive officer, Steven P. Brigham, executed the Agreement on behalf of EB. (Ex. A at 6.)

13. Under the Agreement, EB appointed AMG as EB Sport Group's and EB Brands' "sales representative to solicit orders for Products in the Territory." (*Id.* at § 2.)

14. The "Products" referenced in the Agreement includes products from EB's: 1) "Sport Group", 2) "Travel," and 3) "Gift and Games" product categories. (*Id.* at Schedule 2.)

15. The Agreement's "Territory," alternately referred to in the Agreement as "Accounts," includes "specific retailers in the United States" and is comprised of Walmart, Walmart.com, Sam's Club, and Samsclub.com. (*Id.* at 1, § 1, Schedules 1 and 2.)

---

[1] The parties to the Agreement are AMG (the "Sales Agency"), on the one hand, and EB Sport Group and EB Brands (collectively, the "Company"), on the other hand. As explained in ¶ 3, on information and belief, EB Sport Group and EB Brands are "trade names" used by Defendant EB.

16. The Agreement is subject to a two-year term, from January 1, 2015, through December 31, 2016. (*Id.* at § 3.) EB retained the right under the Agreement to terminate the Agreement with or without cause, by giving AMG "thirty (30) days written notice." (*Id.*)

17. Per the Agreement, EB solely compensated AMG by paying AMG commissions "on the sales of the Products solicited by [AMG] to the Accounts." (*Id.* at § 8(a).) The commission rate[2] applied to such sales is detailed in Schedule 2 of the Agreement. Specifically, for sales of Sport Group Products made to Walmart, AMG's commission rate was 2.25%; for sales of Travel Products made to Walmart, AMG's commission rate was 2.0%; and for sales of Gifts and Games Products made to Walmart, AMG's commission rate was 2.0%. (*Id.* at Schedule 2.)

18. AMG performs the full scope of its contractual obligations owed to EB by soliciting purchases of the Products, participating in meetings with Walmart, making presentations to Walmart, and generally by managing the Walmart buying process. Those efforts, if successful, result in Walmart (or one of its affiliates) issuing a sales commitment. A sales commitment defines the scope of a products Walmart intends to purchase from EB, the forecasted quantities, price, and a duration, which generally runs for one year. After a sales commitment is issued, Walmart will pull inventory against and pursuant to the terms of that commitment by issuing purchase orders. Each purchase order designates the quantities of products Walmart desires to have delivered to a designated Walmart distribution center by an expressed "need by" date.

---

[2] Commission rates under the Agreement were applied to a percentage of "Net Sales Price," that is, "the list price of the Product(s) sold less all returns, discounts, allowances, domestic freight charges, compliance charges and net air freight from factory." (*Id.* at § 8(a).)

19. At the time EB delivers product to Walmart pursuant to the sales commitment and purchase order, EB issues an invoice to Walmart. Walmart pays the EB invoice, at which time EB calculates the commission due under the Agreement and pays it to AMG.

20. The Agreement describes the time at which EB must pay commissions to AMG: "[t]he commission shall be payable on the Fifteenth (15th) day of each month following the payment of the invoices." (*Id.*) By the terms of the Agreement, EB paid commissions to AMG months, and in some cases more than a year, after AMG secured the sales commitment from Walmart, and then only after EB shipped the Products to Walmart and EB invoiced Walmart for the Products.

21. Pursuant to the Agreement, AMG and EB agreed to protect one another's proprietary information. In particular, the parties agreed to "observe complete confidentiality with respect to any data, information, specifications, documentation and other materials (tangible and intangible and machine readable or human readable) which is designed by either such party as confidential, or which otherwise represents the proprietary information of such party." (*Id.* at § 15.) Examples of such information include "vendor costing and pricing, factory source, promotional plans, marketing and trade strategies." (*Id.*)

22. The Agreement is an integrated agreement, in that it "sets forth the entire agreement and understanding of the parties concerning the subject matter hereof and supersedes all prior oral and/or written agreements between the parties hereto." (*Id.* at § 16(b).)

23. The Agreement further states that is "shall be governed by and construed in accordance with the laws of the State of New York." (*Id.* at § 16(e).) The parties' understanding of this provision is informed by Ark. Code Ann. § 4-70-305 (2015), which states: "[a] provision of this subchapter may not be waived, whether by express waiver or by attempt to make a

contract or agreement subject to the laws of another state. A waiver of a provision of this subchapter is void."

C. **For Years, AMG Earned Commissions, and EB Paid Commissions, Including Commissions Earned and Paid Pursuant to the Agreement**

24. For the first 15 months of the Agreement's term, the parties' relationship functioned as intended, much as the parties' relationship has functioned since 1989.

25. Over the past several years, AMG arranged sales of EB's Sporting Goods, Travel, and Gift and Games Products to Walmart, EB shipped the Products to Walmart, EB invoiced Walmart for the Products, Walmart paid EB for the Products, and EB, in turn, paid commissions to AMG.

26. In the Sporting Goods Product category and the Travel Product category, during the three "mod" years[3] immediately preceding the Agreement, AMG facilitated significant sales to Walmart and EB paid AMG commissions on those sales. AMG completed sales to Walmart from EB's Gift and Games Product category for the first time in 2014. Again, prior to entering into the Agreement, and EB paid AMG commissions on sales of Products in the Gifts and Games category.

27. During the Agreement's term, up through February 2016, for all three Product categories (Sporting Goods, Travel, and Gift and Games), EB has already paid AMG $245,289.92 in total commissions.

D. **On April 1, 2016, EB: (1) Unilaterally Terminated and Repudiated the Agreement, without Thirty Days' Notice, "Effective Immediately," (2) Wrongly Attempted to Restrict AMG's Ability to Communicate With**

---

[3] Sales for the Sporting Goods Products, Travel Products, and Gift and Games Products are typically recorded based on Walmart's "mod" timing. A "mod" refers to the designated space that that each Product is selected to occupy within the retailer's shelves or displays. The Sporting Goods Products and Travel Products mods run for one year, from September through August. The Gift and Games Product category mod is seasonal and tracks the Christmas holiday season—Products hit Walmart stores in October and are sold through Christmas Day.

**Walmart, and (3) Announced That It Would Refuse to Pay Any Further Commissions to AMG**

28. On April 1, 2016, without warning, EB wrote to AMG, providing notice that it was terminating the Agreement, effective immediately. Here, reproduced in its entirety, is EB's explanation for ending the parties' 27-year business relationship:

> As a result of various breaches in agreement [*sic*] both specific and implied along with the assurance of continued participation on the part of R.J. Grisoff at all major presentations which hasn't occurred we are terminating the agreement today for cause.

A true and correct copy of EB's April 1, 2016, termination letter to AMG is attached hereto as Exhibit B and is incorporated herein by reference.

29. EB's termination letter did not describe what, in its view, constituted "specific" or "implied" breaches of the Agreement or how AMG had failed to perform any duty under § 6 of the Agreement. (Ex. B.)

30. R.J. Grisoff's name does not appear anywhere in the Agreement. (*Id.*) There is no requirement in the Agreement that R.J. Grisoff attend sales presentations relating to EB's products.

31. The same day as EB provided AMG with notice of EB's intent to terminate the Agreement, EB further repudiated the Agreement by shutting off AMG personnel's access to resources, like EB's email accounts maintained by AMG personnel and EB's RetailLink account, necessary for AMG to provide sales representation of EB's products to Walmart. As of April 1, 2016, therefore, EB's purposeful actions rendered AMG unable to perform any further sales functions with respect to Walmart, in spite of the Agreement's requirement in § 3 that EB provide AMG with 30 days' written notice before terminating the Agreement.

32. In its termination letter, EB threatened AMG that "[a]ll communication regarding this termination with Walmart will be the responsibility of EB and no one at [AMG] is to discuss

or respond to Walmart. We view this as part of the confidentiality [term in the Agreement]." (*Id.*) The Agreement does not provide EB with any right to restrict AMG's contact with Walmart post-termination. (Ex. A § 15.) Neither Walmart specifically nor any other Territory or Account generally are mentioned in the Agreement's confidentiality section, nor does that section make any reference, express or implied, that would allow the form of prior restraint alleged by EB. (*Id.*)

33. The reference to terminating the Agreement "for cause" in EB's April 1, 2016, termination notice is a pretext EB intends to use to avoid paying any further commissions to AMG, despite the fact that—or, perhaps, because of the fact that—AMG has already extensively presented Sporting Goods, Travel, and Gift and Games Products to Walmart, and Walmart is now closing several significant, multi-million dollar sales commitments to purchase EB Products.

### E.     EB Owes AMG Payment for Outstanding Commissions

34. The Agreement unambiguously provides for the payment of post-termination commissions to AMG. First, under the Agreement, EB agreed to "pay commissions on all orders submitted by [AMG] to, and accepted by, [EB], prior to the date of termination in accordance with paragraph 8 of [the] Agreement." (Ex. A § 16(d).)

35. Second, if the Agreement is terminated "without cause," EB is to pay AMG "commissions for a period of time based on mod set timing (respective to timing for Sport Group or Travel mod sets)." (*Id.* at § 8(c)(1).) Walmart has already made, and during the thirty day termination period otherwise required by the contract, will have made, mod set decisions for upcoming mods in the Sport Group and Travel Product categories. In such a situation, post-termination of the Agreement, AMG is to "receive full commissions until the next mod set." (*Id.*

at § 8(c)(1)(b).) The Agreement helpfully provides an illustration: "for example, termination on March 1 after a February 28 decision would result in full commissions on sales up until the date of the next mod set, for example Sept. 15." (*Id.*)

36. Per the Agreement's express text, AMG is entitled to its "full commissions on sales up until the date of the next mod set."

37. Walmart made its mod set decisions for the current sales commitment period in 2015 and will, or has already made, mod set decisions resulting in sales commitments at the time of, or shortly after, EB unilaterally repudiated the Agreement without notice.

38. Under the Agreement, through February 2016, EB has paid AMG $245,289.92 in commissions based upon sales made for Products in the three relevant Product categories.

39. Pursuant the Agreement, through February 2016, AMG is owed $37,465.51 in unpaid commissions on shipped and invoiced sales of Products in the in the three relevant Product categories.

40. AMG currently estimates that EB owes AMG no less than $679,078.68 in commission payments based upon work already performed by AMG under the Agreement and prior to EB's unnoticed repudiation. AMG's estimate is based upon and is consistent with AMG's historical earned commissions, both before and during the Agreement's term.

### COUNT I
### BREACH OF CONTRACT

AMG restates all of the foregoing paragraphs of this Complaint and further states and alleges as follows:

41. AMG and EB are parties to the Agreement, which is a valid and enforceable contract.

42. AMG, in performing under the Agreement, successfully solicited purchases of the Sporting Goods, Travel, and Gift and Games Products from Walmart; participated in meetings with Walmart; make presentations to Walmart; and generally managed the Walmart buyer. AMG fully performed all of its other duties under § 6 of the Agreement.

43. EB breached the Agreement by refusing to provide 30 days' written notice to AMG prior to termination of the Agreement, as required by § 3 of the Agreement.

44. EB further breached the Agreement by repudiating its obligation to pay AMG any further commissions, including any post-termination commissions, contrary to § 8(a), § 8(b), § 8(c)(1), § 8(c)(1)(b), and § 16(d) of the Agreement.

45. As a direct and proximate result of EB's breaches of the Agreement, AMG has suffered damages in excess of $75,000. AMG presently estimates that it has incurred approximately $679,078.68 in damages directly and proximately caused by EB's breaches of the Agreement.

## COUNT II
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

AMG restates all of the foregoing paragraphs of this Complaint and further states and alleges as follows:

46. AMG and EB are parties to the Agreement, which is a valid and enforceable contract.

47. AMG fully performed all of its duties under the Agreement.

48. EB has engaged in arbitrary and unreasonable conduct that has the purpose and the effect of preventing AMG from receiving benefits owed to AMG under the Agreement. EB has also frustrated the overarching purpose of the Agreement by taking advantage of its position to control implementation of the Agreement's terms.

49. Specifically, the Agreement contains implied obligations on the part of EB to not interfere with AMG's performance of the Agreement during thirty days following notice of termination.

50. EB has breached the duty of good faith and fair dealing by shutting down AMG's email access, shutting down AMG's access to RetailLink, directing AMG to immediately have no further communications with Walmart, and otherwise hindering and interfering with AMG's ability to finalize and close a number of Walmart sales commitments that were closing, or on the verge of closing, at the time EB repudiated the Agreement.

51. As a direct and proximate result of EB's breaches of the implied covenant of good faith and fair dealing, AMG has suffered damages in excess of $75,000. AMG presently estimates that it has incurred no less than $679,078.68 in damages directly and proximately caused by EB's breaches of the implied covenant of good faith and fair dealing.

## COUNT III
## VIOLATION OF ARK. CODE ANN. § 4-70-301 (2015), ET SEQ.

AMG restates all of the foregoing paragraphs of this Complaint and further states and alleges as follows:

52. EB is a "principal," as defined by Ark. Code Ann. § 4-70-301(2) (2015), as EB does not have a permanent or fixed place of business in Arkansas; EB produces, imports, or distributes a product for sale to customers who purchase the product for resale; EB uses a sales representative to solicit orders for its products; and EB compensates a sales representative in whole or in part by commission.

53. AMG is a "sales representative," as defined by defined by Ark. Code Ann. § 4-70-301(3) (2015), because AMG solicits on behalf of EB orders for the purchase at wholesale of EB's products.

54. EB pays AMG in "commissions," as defined by Ark. Code Ann. § 4-70-301(1) (2015), as EB compensates AMG "in an amount based on a percentage of the dollar amount of certain orders for, or sales of, the principal's product."

55. The Agreement is a written "contract between a principal and a sales representative under which the sales representative is to solicit wholesale orders within" Arkansas, and the Agreement sets forth "the method by which the sales representative's commission is to be computed and paid," in compliance with Ark. Code Ann. § 4-70-302 (2015).

56. Under Ark. Code Ann. § 4-70-306 (2015), "a principal who fails to comply with a provision of a contract under § 4-70-302 relating to payment of a commission…is liable to the sales representative in a civil action for three (3) times the damages sustained by the sales representative, plus reasonable attorney's fees and costs."

57. EB has refused to comply with provisions in the Agreement relating to payment of commissions, resulting in estimated unpaid commissions owed to AMG in the amount of $679,078.68. As a result, pursuant to Ark. Code Ann. § 4-70-306 (2015), EB is liable to AMG for damages in an estimated amount of $2,037,236.04.

58. Additionally, per Ark. Code Ann. § 4-70-306 (2015), because EB has refused to comply with provisions in the Agreement relating to payment of commissions, EB is also liable to AMG for AMG's "reasonable attorney's fees and costs."

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, AMG hereby demands a trial by jury.

**WHEREFORE**, AMG respectfully prays for this Court's judgment as follows:

1. Awarding AMG compensatory damages against EB for EB's breaches of the Agreement, in an amount to be proved at trial, in excess of $75,000, and presently believed to be not less than $679,078.68;

2. Awarding AMG statutorily-provided treble damages under Ark. Code Ann. § 4-70-306 (2015) against EB, in an amount to be proved at trial, in excess of $75,000, and presently believed to be not less than $2,037,236.04 (inclusive of damages suffered by AMG as a direct and proximate result of EB's breaches of the Agreement);

3. Awarding AMG its statutorily-provided reasonable attorney's fees and costs under Ark. Code Ann. § 4-70-306 (2015) against EB;

4. Awarding AMG the full amount of all applicable pre-award and post-award interest; and

5. Granting AMG all other such and further relief as the Court deems just and equitable under the circumstances.

Dated: April 8, 2016                          Respectfully submitted,

                                              **KUTAK ROCK LLP**

                                              _____
                                              Russell Atchley, AR 82007
                                              russell.atchley@kutakrock.com
                                              Stephen Dacus, AR 2014018
                                              stephen.dacus@kutakrock.com
                                              234 East Millsap Road, Suite 200
                                              Fayetteville, Arkansas 72703
                                              (479) 973-4200
                                              (479) 973-0007 Fax

**OF COUNSEL:**
(*Pro Hac Vice Application or other Form of Admission Forthcoming*)

**STOEL RIVES LLP**

Eric A. Bartsch (MN Bar #243723)
W. Teague Orgeman (MN Bar #389241)
33 South Sixth Street, Suite 4200
Minneapolis, MN 55402
Telephone: 612-373-8800
Facsimile: 612-373-8881
Email: eabartsch@stoel.com
Email: wtorgeman@stoel.com

**ATTORNEYS FOR PLAINTIFF ACTIVE MARKETING GROUP, INC.**